Fazil A. Munir, Esq. (Bar # 277108)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Sheila Bayne, Esq. (Bar # 123801)
*ATTORNEY TO BE NOTICED*
LAW OFFICES OF FAZIL A. MUNIR, ESQ.
4000 MacArthur Blvd.,
East Tower, Suite #600
Newport Beach, CA 92660
Telephone: (949) 636-6994
Facsimile: (714) 276-6437
fazil@autismlaws.com
Sheila@autismlaws.com

Deborah S. Reisdorph, Esq. (Bar # 164066)
SKANADORE REISDORPH LAW OFFICE
16541 Gothard St, #208
Huntington Beach, CA 92647
Telephone: (714) 375-1529
Deborah@ladylawca.com
*ATTORNEY TO BE NOTICED*

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| **CRISTIAN OMAR DIAZ GUEVARA**, formerly minor **C.G.**, **BLANCA** and **BENJAMIN MENESES**, <br><br> Plaintiffs, <br> v. <br><br> **CHAFFEY JOINT UNION HIGH SCHOOL DISTRICT**, <br><br> Defendant. | **Case No.** _____ <br><br> **APPEAL OF ADMINISTRATIVE DECISION AND ORDER BY THE OFFICE OF ADMINISTRATIVE HEARINGS, CASE NO. 2020010176, PURSUANT TO THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, TITLE 20 U.S.C. § 1400 et seq., AND CIVIL RIGHTS CLAIM** |

**TO THE HONORABLE COURT AND TO ALL PARTIES:**

## COMPLAINT

**COME NOW** Plaintiffs CRISTIAN OMAR DIAZ GUEVARA, and BLANCA and BENJAMIN MENESES, for their complaint and hereby appeal the decision of the State of California Office of Administrative Hearings, Case No. 2020010176 (*see* Exhibit A), denying C.G.'s due process complaint against Defendant CHAFFEY JOINT UNION HIGH SCHOOL DISTRICT, and seek compensation for the violation of C.G.'s civil rights, allege as follows:

## JURISDICTION AND VENUE

1.     This Honorable Court has jurisdiction over this matter under 28 U.S.C. §1331, as this matter arises under one or more federal statutes, including specifically the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq*. (the "IDEA"), and pursuant to 34 C.F.R. §300.516(b), as referenced in California Education Code section 56505(k), which grants parties the right to appeal decisions issued by the State of California Office of Administrative Hearing to United States District Courts without regard to the amount in controversy.

2.     Venue is appropriate in this Court under 34 C.F.R. §300.516(b) as such actions may be brought in any District Court of the United States, and 28 U.S.C. §1391 because Defendant CJUHSD is organized to conduct its business within this district and the events or omissions giving rise to the claims herein occurred in this judicial district.

## **THE PARTIES**

3.      When these matters began, Plaintiff C.G. ("C.G." or "Plaintiff") was a 17 year old student residing within Defendant CJUHSD's geographic boundaries, entitling him to attend Los Osos High School.  C.G. lived with his aunt and uncle, BLANCA and BENJAMIN MENESES, who held educational decision-making authority for C.G.

4.      BLANCA and BENJAMIN MENESES ("Parents") were legally responsible for C.G.'s welfare and qualified as his "parents" as defined under the IDEA.  *See* 34 C.F.R. §300.30(a)(4).   C.G. assigned them decision-making authority over his educational rights for the purposes of filing and prosecuting the due process hearing below.

5.      Defendant CHAFFEY JOINT UNION HIGH SCHOOL DISTRICT ("District" or "Defendant CJUHSD") is a public entity organized and existing pursuant to the laws of the state of California and doing business as a public-school district.  As such, District is subject to the IDEA and California education law and was, at all times herein, responsible for the education of C.G.

## **FACTS**

6.      C.G. and his cousin J.A. legally immigrated from Honduras to California in April 2018.  Prior to coming to the United States, the furthest C.G. had advanced in school was the 6th Grade in Honduras, and he repeated the 5th Grade twice.  *See* Exhibit J.  He had not been in school since 2016.  C.G. spoke only Spanish upon his arrival in the United States.

7.      Both C.G. and J.A. enrolled in the CJUHSD in April 2018.

8.      To accomplish that enrollment, on or around April 9, 2018, Parents retained Mr. James Peters as their representative. Mr. Peters only represents

students with special needs as the Executive Director of a Special Education Law Firm. Mr. Peters called the District's Director of Special Education, Ms. Kelly Whelan, to advise her that C.G. and J.A. would be enrolling and had special needs.   Ms. Whelan is responsible for overseeing assessment plans and assessments, and she forwards requests for assessment made to her to the appropriate school psychologist, who conducts the assessments. Ms. Whelan and Mr. Peters know each other very well and have handled more than a dozen Due Process hearings, and even more IEP team meetings over the past five years.

9.   Following the phone call, Mr. Peters emailed Ms. Whelan reminding her that "two children with special needs" would be enrolling in the District.  *See* Exhibit B, C.  He further wrote, "they will be attending Los Osos High School, and will require a full assessment."  Ms. Whelan asked who these students were and if they had IEPs.  *See* Exhibit B.  Mr. Peters responded the next day by forwarding C.G.'s birth certificate, sixth grade Honduran report card and immigration documents, indicating that this is the information "on the students" and that the "[i]nformation for the second student will come in a separate mail promptly."  *See* Exhibit B; Exhibit D.  The second student was J.A.

10.   At the Office of Administrative Hearing ("OHA") hearing, the District contended that this did not constitute a request to assess C.G.  *See* Exhibit A at 9.

11.   Specifically, Ms. Whelan contended that she was confused as to whom Mr. Peters could have been referring to when he asked for an assessment because (1) he didn't name J.A. or C.G. during the phone call nor did he mention that they had special needs, even though she also testified that Mr. Peters told her during the phone call he would be enrolling two students on behalf of the Meneses (*see* Exhibit W, Testimony-J.A. Whelan, p.92) and the identifier

information he provided for the two children identified them as being enrolled by the Meneses, and (2) the emails themselves were not enough for her to understand who Mr. Peters was referring to or that he was identifying them as having special needs because, according to Ms. Whelan, (i) the first email "wasn't part of this [second] email" (*see* Exhibit Q, Testimony Whelan, p.86), even though they were an email chain, (ii) the email was not a request for an assessment despite saying "two students with special needs" who "will require a full assessment" would be enrolling because "I don't see this as a request for an assessment.  I was concerned more about getting them registered" (*see* Exhibit Q, Testimony Whelan, p.88), and (iii) even though she responded at the time by asking if these special needs students had IEPs that did not mean she saw this as having anything to do with special needs because "This – this – when he's saying this about the – two students that are enrolling, my focus is on their enrolling.  How old are they and do they have an IEP?  I'm the director or special ed, so I – I oversee the IEP process." (*see* Exhibit Q, Testimony Whelan, p.91). The numerous interactions and conversations over the years between Mr. Peters and Ms. Whelan only pertaining to Special Education students. The emails and sworn testimony of Ms. Whelan is an implausible claim.  In any event, her *ex post facto* explanations are not credible because she testified clearly that she has no recollection of the email at the time.  *See* Exhibit Q, Testimony Whelan, p.80-81.  She had no recollection of it when she testified in the J.A. OAH hearing either.  *See* Exhibit W, Testimony-J.A. Whelan, p.64 ("I can't give you thoughts about the email if I don't remember reading it").

12.     Also, while Ms. Whelan claims now that she did not know that Mr. Peters was requesting an assessment for J.A. and C.G., she contradictorily testified at J.A.'s hearing that she knew from the email that Mr. Peters was

seeking a full assessment.  *See* Exhibit W, Testimony-J.A. Whelan, p.64.

13.    The chain of emails makes it clear that Mr. Peters identifies two students as needing special assessments and who they are.  Ms. Whelan asks who they are.  He responds by providing their identifier information for J.A. and C.G. and describing them as the two students.  *See* Exhibit B; Exhibit D.  That should have put her on notice.  And at J.A.'s hearing, Ms. Whelan even admitted that she became aware on April 10th, when she got J.A.'s identifier information, that J.A. was one of the "two children with special needs" to whom Mr. Peters was referring:

> **THE COURT:**  Thank you.  So April 10, 2018, 10:21 a.m. is the first time you're aware that the student that is being referred to was J.A.?
>
> **THE WITNESS:**  Yes.  The first time I received the documents, yes."

*See* Exhibit W, Testimony-J.A. Whelan, p.72.  That meant she had to know C.G. was the other.  She still did nothing though.

14.    Moreover, at no point did Ms. Whelan follow up this phone/email conversation by (1) suggesting that she still did not know who the two students needing assessments were or asking their identities after she was told about J.A. and C.G. or (2) by indicating in any way that she considered J.A. and C.G. as something other than the two students referenced in the email as needing assessments.

15.    Ms. Whelan also now argues that Mr. Peters failed to identify himself specifically as C.G.'s representative and that she would not have considered the request for an assessment to be a request for an assessment because "I had no way of knowing if Mr. Peters was their representative" (*see*

Exhibit Q, Testimony Whelan, p.87).  But Ms. Whelan never indicates that she fails to understand this when she takes J.A.'s and C.G.'s information from Mr. Peters and says, "Thank you Mr. Peters.  I have contacted LOHS and will forward this information [C.G.'s identifier information] to them.  I spoke with Susan Malone, Assistant Principal."  *See* Exhibit B.

16.     In a dramatic bit of compartmentalized reasoning, the OAH decision appealed here concluded that the "evidence did not support that Student or anyone acting on Student's behalf, requested special education assessment on April 9, 2018" (*see* Exhibit A at 9) because:

> (1) The April 9, 2018 email did not identify C.G. by name as the child for whom Mr. Peters was requesting an assessment (*see* Exhibit A at 8), even though he attached C.G.'s identifier information to the follow-up email in the chain.  *See* Exhibits B, D.

> (2) Ms. Whelan asked for the names of the student and if they had IEPs, "but Peters never responded," (*see* Exhibit A at 8) even though he actually forwarded C.G.'s identifier information in response.  *See* Exhibits B, D.

> (3) Contradicting its own finding of Mr. Peters never responding, the OAH further found that while Mr. Peters did provide C.G.'s birth certificate, sixth grade Honduran report card and immigration documents, "[n]one of the three pages referenced a request for assessment."  *See* Exhibit A at 9.  But of course, the initial email did and there is no legal requirement the request be made on each document independently.

> (4) Mr. Peters never mentioned C.G. by name during the phone call prior to the email which call was "about another Chaffey student... a different student unrelated to this family," (*see* Exhibit A at 9), even though Ms. Whelan testified that Mr. Peters said the two students would be with the Meneses family which had to be C.G. and J.A.  *See* Exhibit Q, Testimony Whelan, p.92.

> (5) Mr. Peters never stated that he had the authority to act on C.G.'s behalf (*see* Exhibit A at 8), but Ms. Whelan never mentioned this

supposed defect at the time and she simultaneously took C.G.'s identifier information from Mr. Peters to enroll him without raising this objection.  Nor can she explain why she never followed up with Mr. Peters about the "two students," because the idea of questioning whether or not he represented a family she already knew he represented never occurred to her.

Under California law, all referrals for special education and related services *shall* initiate the assessment process (Cal. Code Regs., tit. 5, § 3021, subd. (a)) with a referral for a special education assessment meaning <u>any</u> written request for assessment to identify an individual with exceptional needs made by a parent, teacher, or service provider of the individual (Cal. Educ. Code, § 56029, subds. (a)-(b)).  *See* Exhibit A.  Nowhere does the code allow a District to avoid its legal obligations by inventing an after-the-fact paperwork requirement it didn't even consider at the time (and waived if it had), and allowing Districts to start inventing such requirements opens the door to abuse and a diminishment of the statute through the invention of new hurdles never contemplated by the law.

(6) C.G. wasn't living in the District yet when this call was made and would not enroll for two more weeks as he was completing the immigration process, supposedly making it unreasonable for Ms. Whelan to connect the dots to C.G. (*see* Exhibit A at 9), even though the dots were connected during this email exchange.

17.    No assessment was done of C.G. at that time.

18.    The District placed C.G. in the Newcomer English Language Development Program at Chaffey High School because he had no English language skills.  They did not perform any assessment prior to placing him.

19.    After enrollment, the District discovered that C.G. struggled to communicate intelligibly either in English or in Spanish.

20.    Other behaviors suggested the need for special education as well. The following was reported by C.G.'s teachers:

(1) Mr. Haslewander documented C.G.'s inability to communicate

8

intelligibly and described him as "confused", "immature" and having "inappropriate/poor" interactions with peers.  He reported, "His attendance and motivation are inadequate for success.  He has not demonstrated a strong work ethic or a willingness to complete assignments.  He often interacts with his peers inappropriately, especially with female students." *See* Exhibit H p.153-154.

(2) Ms. Tremblay, Mr. Segovia and Mr. Haslewander noted behaviors of truancies, absences, and failing grades. *See* Exhibits F, H.

(3) He was caught cheating by Mr. Segovia. *See* Exhibit F.  Mr. Segovia also described him as "manipulative", "difficult to understand", "immature" and describes his poor social interactions including being "moved twice first semester for harassment of young ladies." *See* Exhibit H p.155.

(4) Ms. Tremblay, who taught C.G.'s ELA learners' class and ELA English, reported that C.G. "needs constant monitoring and gets easily distracted" and that she sometimes needed to keep his notes for him, or he would lose them. *See* Exhibit K.  She agrees he is "difficult to understand," "ignores" authority, is "unresponsive" to his environment, "does not attempt to do classwork" and "takes items without permission." *See* Exhibit H p.155.

(5) Mr. Tatum reports "[i]t has been a struggle to get him to do any work in class." *See* Exhibit H p.156.

(6) His grades consisted almost entirely of F's. *See* Exhibit G.  Of the 60 credits attempted, he had completed only 15 with a total GPA of 0.50.  His first semester was a 0.0 GPA.  His second semester was 0.42.  His third improved to 1.0, but he had dropped to two classes only and one of those was an F, so his improvement was one class. *See* Exhibit G.

These teacher observations alone are sufficient grounds to suspect disability so as to require an assessment.  Adding the fact C.G. received all F's for the first half of the year, and the comment about C.G.'s inability to benefit from his education clearly establishes suspected disability sufficient to require assessment.  Behavior intervention is considered a designed instruction and service (Cal. Educ. Code, §§

56520 et seq.; Cal. Code of Regs., tit. 5, § 3052) and if a student's behavior or performance indicates a need for special education, the district is deemed to have knowledge of that fact.  20 U.S.C. § 1415(k)(8)(3)(ii).

21.    The "child find"-related provisions in section 612(a)(3) of the IDEA require that States have in effect policies and procedures to ensure that all children with disabilities, including all children who are in need of special education and related services are identified, located, and evaluated. 20 U.S.C. §1412(a)(3) and 34 CFR §300.111. This applies to all students, of all ages, suspected of having a disability as defined under the IDEA, including highly mobile and migrant children with disabilities, and children who are suspected of being a child with a disability even though they are advancing from grade to grade, as well as children with various disabilities, including those with visual impairment, emotional disturbance, other health impairment, and learning disabilities. *See* 34 CFR §300.8(b). 34 CFR §300.111(a) and (c).

22.    Local education agencies must also have child find policies and procedures in effect that are consistent with the State's policies and procedures. 34 CFR §§300.200-300.201. In addition, a State must ensure that a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services. 34 CFR §300.111(a)(ii). Therefore, as part of a State's child find responsibilities, a district must carry out activities to determine whether a child is a child suspected of having a disability who should be referred for an evaluation to determine eligibility for special education and related services under Part B. California law requires the District to assess Student at the first warning sign of a potential disability and before any placement is offered. Cal. Educ. Code § 56320.

23.    Yet, not one teacher or Administrator requested an assessment of

C.G.

24.     Rather than treat these things as a red flag triggering an assessment, the District chose to attribute all of C.G.'s failings and odd behaviors to C.G. being from Honduras and speaking a dialect not understood by staff or others, with several teachers stating that failing grades was "typical" of students new to Newcomer Program.  In fact, according to OAH:

> Rivera opined that English language learners typically manifested characteristics of inattentive, hyperactive, impulsive, distractible, disruptive, disorganized, and forgetful behaviors, along with a tendency to be slow in starting and finishing tasks as part of the acculturation and adaptive process.

*See* Exhibit A at 52.  Why a student would be disruptive, inattentive, hyperactive, forgetful or impulsive merely because they did not speak English or grow up in the United States is unclear, but this description calls into question whether this program is merely a way to shift foreign special needs students into this program without assessing them or giving them IEPs.   OAH accepted the District's assertion, nonetheless.

25.     In addition to his behavioral problems, C.G. displayed evidence of a visual disability, which affected his grades.

26.     At the OAH hearing, the District contended that C.G.'s vision difficulties did not trigger an assessment because they did not impair school access or determine classroom function and could be corrected with glasses.  *See* Exhibit A at 12.  OAH found that Parent circled "no" on the enrollment form when asked if C.G. had vision problems or needed glasses, that C.G. did not wear glasses and that he exhibited no vision difficulties affecting his class work.  *See*

Exhibit A at 12.  There is no valid basis for this finding.

27.   Indeed, C.G.'s first semester Spanish II teacher, Ms. Josafina Weber, noted early on in that semester that C.G. had severe vision problems.  *See* Exhibit F.

28.   Ms. Tremblay documented a conversation she had with Ms. Meneses on October 16, 2018 (a full year before the District finally assessed him) in which Ms. Meneses informed her that C.G. could only see out of one eye.  *See* Exhibit F.  She claimed, however, that C.G. never exhibited any evidence to cause her to suspect that C.G.'s vision was adversely affected by this.  Thus, OAH dismissed Ms. Meneses disclosure as a reason for suspicion of disability and it found that the District "had [no] knowledge of, or reason to suspect, that he had a vision impairment that adversely impacted his access to education."  *See* Exhibit A at 13.

29.   Yet, even school psychologist Saul Rivera agreed that:

> Q.   When a student's receiving failing grades in their academic classes and it's for an entire year and there are reports of blindness in one eye, do you believe it's appropriate for the District to assess the student's vision?
>
> A.   Yes.

*See* Exhibit R, Testimony Rivera, p.78.

30.   Moreover, Dr. Beth Ballinger, an expert in optometry and infant/children's vision examinations (*see* Exhibit M) who conducted her own independent assessment of C.G. (*see* Exhibit U, Testimony Ballinger, p.96) prior to the IEP meeting provided photographic evidence, which was presented to OAH, showing that C.G. could be seen in class tilting his head to one side and

putting his face very close to his paperwork, indicating extreme vision issues (*see* Exhibit U, Testimony Ballinger, p.135-145). She also noticed teachers correcting his work multiple times in class, making his grades a questionable measure of his success and suggesting that his teachers should have known there was a problem. *See* Exhibit L.

31. Dr. Ballinger testified that C.G. qualifies for special education under other health/vision impairment because he had visual motor and perceptual abilities processing needs, and his functional vision assessment scores were low. *See* Exhibit U, Testimony Ballinger, p.148. She explained that his amblyopic right eye (a lazy eye) affected his ability to coordinate with the other eye. *See* Exhibit U, Testimony Ballinger, p.106-112. The disparities between the eyes disrupted C.G.'s visual clarity, accuracy, and speed, for example affecting his ability to read/scan text quickly without losing his place. Dr. Ballinger attributed several of his observed behaviors to C.G.'s vision disability. *See* Exhibit U, Testimony Ballinger, p.111-114, 116.

32. OAH found this unpersuasive because C.G.'s teachers reported that he supposedly did not act differently than the other students. *See* Exhibit A at 45. However, C.G.'s teachers have no training on assessing vision. It is impractical to contend a person with no visual clarity training, no ophthalmologist knowledge or training, or knowledge of what an amblyopic eye is could report on visual differences between students. The Judge erred in the determination that an untrained teacher would be more knowledgably than an Expert vision doctor recognized through the country as one of the best vision assessors and training professors at vision universities. (vita).

33. Dr. Ballinger, the only expert Ophthalmologist who assessed C.G. testified to the contrary, stated C.G. needed vision therapy to benefit from

13

wearing glasses.  She testified it was painful for him to wear glasses and why he could not and would not wear glasses.  The District had no vision expert assess C.G. at all.  The closest District personnel came to having vision knowledge was the school nurse who could not assess his vision due to the fact she does not speak or understand Spanish.  In essence OAH determined expert and renown Ophthalmologist testimony was given less weight then the school nurse who had no vision training and was unable to communicate with C.G. regarding his visual deficits.  OAH's decision is inconsistent with the record.  OAH erred in their decision to find no vision impairment eligibility.

34.     The District's IEP assessment was invalid too regarding this matter. Under IDEA, the SEA must establish and maintain qualifications to ensure that personnel necessary to carry out the purposes of Part B of IDEA are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities. 20 U.S.C. § 1412(a)(14) and 34 C.F.R. § 300.156(a). In addition, the public agency must ensure that each child's evaluation is conducted by trained and knowledgeable personnel. 34 C.F.R. § 300.304(c)(1)(iv) and 20 U.S.C. § 1414(b)(3)(A)(iv). IDEA does not address which specific providers are considered qualified personnel. LEAs are permitted to obtain a medical diagnosis to determine if a child's medically related disability results in the child's need for special education and related services." In the case of a suspected "visual impairment including blindness," a diagnosis may be made by a medical professional such as the child's pediatrician, an ophthalmologist, or optometrist. See OSEP Memo 17-05: Re: Eligibility Determinations for Children Suspected of Having a Visual Impairment Including Blindness under the Individuals with Disabilities Education Act (May 22, 2017).  Therefore, depending on the child's situation, an optometrist could be

considered "qualified personnel" under 34 C.F.R. § 300.156.  The others could not.

35.     As an aside, upon entering school districts, all students are screened for basic health, hearing and vision.  Nowhere in C.G.'s records, is there any record of the District conducting such a screening.

36.     All told, even if C.G.'s parent had not requested an assessment at all from Chaffey High School, C.G.'s desperate need for intervention to address the likelihood that he had multiple disabilities as defined under the IDEA was glaringly obvious from the start, and yet he was placed on a fast track to graduate high school:

(1) Not long after enrollment, a teacher made an entry in the Teacher Community Log that C.G. *was blind in one eye*, which alone should be more than enough to trigger a state-mandated request for special education assessment. Yet, no one responded to this vitally important information.

(2) C.G., having been placed in an ELD program only was consistently failing and continued to decline academically and behaviorally. His First Semester Quarter Progress Report Card for the 2018-2019 school year consisted of four F grades in U.S. History, World History, Int. Math and ELD Reading. He received a D- grade in ELD.  Comments included "Student is currently failing class." "Needs to spend more time/effort on assignments," "needs to complete homework/assignments/projects," and "needs to be better prepared for tests." His report card for the period from August 8, 2019, through October 5, 2019, shows four F's in English Learning Development class, with teacher Tremblay, World History, U.S. History, Math, and a "C" in cabinet making, and "D" in English Learning Development class with teacher Sanchez.

(3) Despite C.G.'s terrible academic record from April 2018 to the end of the 2017-2018 school year as a 10th grader, the District designated Student as a 12th grader in August 2018 for the 2018-2019 school year, all set for graduation. This action meant that, in essence,

C.G. had skipped the 11th grade. There were no formal or informal assessments that justified him skipping a full year's worth of education. He had barely passed his classes the year prior. This change happened without any student or Parent/Guardian consent or participation. Rather than fast-tracking C.G. for graduation, the District at the very least was under a mandate to intervene; yet, there was no regard paid to a request for assessment by the parent, and no mandated action taken by the school such as referral to a Student Study Team or even an eye exam. Instead, a newcomer from Honduras was shuffled into an ELD program and sent rapidly on his way to the school exit. In this instance, the district ignored state and federal rule of law.

37.     C.G. had absences which the District claims were responsible for his grade falling again. It uses those to excuse his bad grades as a red flag. The problem is that the absences themselves are a red flag suggestive of disability. *See* Exhibit S, Testimony Paltin, p.204.

38.     Parents requested an IEP meeting for the second time. The District agreed.

39.     Prior to the IEP meeting, assessments were conducted of C.G. by school psychologists Saul Rivera and Isela Arce, speech and language pathologists Claudia Ceballos and Rhea Lynch, and Pat Murphy, a school nurse. Each of these assessments suggested that C.G. should have been eligible for special needs services, except that the District dismissed each of the results showing eligibility and instead substituted the opinion of Mr. Rivera that C.G. was fine.

40.     Ms. Arce administered the following tests:

(1) Nonverbal Intelligence Test, Second Edition.

(2) Kaufman Assessment Battery for Children, Second Edition.

(3) Bateria Achievement, Fourth Edition, in Spanish.

(4) Bateria Cognitive, Fourth Edition, in Spanish.

41.    Mr. Rivera administered the Developmental Test of Visual Perception for Adolescent and Adult and the following questionnaires:

(1) Behavior Assessment for Children, Third Edition.

(2) Children's Depression Inventory, Second Edition.

(3) Adaptive Behavior Assessment System, Third Edition.

(4) Rating Scale of Impairment.

They were all also chosen by Dr. Rivera, including those administered by Ms. Arce.  *See* Exhibit A at 17.

42.    As OAH points out, these tests are standardized, were used for the purpose intended, administered by knowledgeable personnel trained and qualified to administer the assessments, and were chosen to cross-validate C.G.'s intellectual ability.  *See* Exhibit A at 17-18.

43.    Plaintiff's expert Dr. Paltin reviewed both the selection and the District's interpretation of tests that were included in the multidisciplinary assessment and too noted the District's selection of particular tests was valid and appropriate for C.G.  *See* Exhibit S, Testimony Paltin, p.211, 244-245.  He disagrees with Mr. Rivera's attempts to disavow the tests he himself chose now that they point to disability.

44.    The test results showed that C.G.'s intellectual ability was rated as well below average.  *See* Exhibit H p.160.  His broad memory measure was below average.  *See* Exhibit H p.160.  He scored below average on reasoning (*see* Exhibit H p.161) and well below average on quantitative measures, including nonsymbolic quantity task and numerical series.  *See* Exhibit H p.161.  He scored well-below average on the nonverbal index scale.  *See* Exhibit H p.162.  He did score well above average on basic reading skills, but below average on reading

fluency.  *See* Exhibit H p.165.  He scored well below average on math calculation skills and math problem solving.  *See* Exhibit H p.166-167.  He scored low average on writing skills.  *See* Exhibit H p.167.

45.    As Plaintiff's expert Dr. Paltin pointed out, these low scores demonstrated that C.G. should have qualified for special needs services.  *See* Exhibit S, Testimony Paltin, p.206, 251.

46.    Rather than accept these findings, however, Dr. Rivera chose to dismiss them on the basis of his opinion that C.G.'s poor showing was the result of C.G.'s cultural disadvantages, specifically his limited English and Spanish proficiency and the five year gap in his reading and math instruction in Honduras. *See* Exhibit A at 20; Exhibit R, Testimony Rivera, p.102-106, 145-146, 167-168. (Mr. Rivera says he actually only knows that C.G. missed two years but suspects three and possibly four – OAH wrongly accepted five years (*see* Exhibit R, Testimony Rivera, p.109; Exhibit A at 46)).  He further opined that the samples used to standardize the tests did not include individuals who spoke the Mayan Spanish dialect used in Honduras.  *See* Exhibit A at 18.

47.    Dr. Paltin testified that these tests were appropriate to administer to C.G. (*see* Exhibit S, Testimony Paltin, p.208-211, 244-245), that many of the tests specifically would have accounted for C.G.'s background (*see* Exhibit S, Testimony Paltin, p.214, 244), that many specifically would have mitigated any language difference (*see* Exhibit S, Testimony Paltin, p.210-211, 227, 234), that the purpose of standardization is to eliminate the effect of these differences (*see* Exhibit S, Testimony Paltin, p.271), that being from Honduras would not have invalidated the results (*see* Exhibit S, Testimony Paltin, p.211-212, 214), and that lengthy absences from education would not have invalidated the results (*see* Exhibit S, Testimony Paltin, p.219).  He further testified that Mr. Rivera chose

non-standard observation over standard testing in each instance (*see* Exhibit S, Testimony Paltin, p.243), and that it was not appropriate to discount the standardize tests (*see* Exhibit S, Testimony Paltin, p.244-245, 211), especially where all the standardized tests pointed in the other direction from Mr. Rivera's conclusion (*see* Exhibit S, Testimony Paltin, p.231).

48.     OAH accepted Mr. Rivera's opinion, however, on the basis that Dr. Paltin didn't speak Spanish, was never a school psychologist, was not an English language trajectory expert, and supposedly didn't rebut Mr. Rivera's claim that C.G.'s problems stemmed from a five-year gap in education. *See* Exhibit A at 22-23. However, Dr. Paltin did address C.G.'s gap in education and he could speak to C.G. through a translator. *See* Exhibit S, Testimony Paltin, p.219, 244.

49.     As for his not being a school psychologist, Dr. Paltin is a licensed psychologist in the State of California and has practiced child and adolescent psychology since 1992, or over twenty-eight years. He has specialization in areas of child development, autism related disorders, child testing and assessment, child abuse assessment and intervention, and childhood mental health disorders. He has taught these subjects in university and college settings and has extensive experience working with children within this scope. He received a Bachelor of Arts degree at the University of Hawaii in 1982 and obtained a Ph.D. in clinical psychology from the United States International University in San Diego, California. He is a published author and paid instructor for large school districts including, Corona Norco School District, Los Alamitos School District, and numerous others, including heading up educational programs for the State of Hawaii, where he addresses mostly students of non-English assessments. He has taught graduate-level courses in Test Construction and Assessment to school psychology students. Dr. Paltin is an adjunct faculty member and teaches child

psychopathology, testing and assessment, child and adolescent development, ethics, cognitive psychology.  He is also an adjunct faculty member at Chapman University and teaches undergraduate courses in abnormal psychology and child development.  He provides and maintains a private practice and consults with the community service agencies, and child and adolescent health care programs.  He conducts psychological assessments on a regular basis and consults with a wide range of professional and non-professional parties, and provides in-services for students in school districts, including the Corona-Norco School District in Riverside County.  Dr. Paltin has completed formal and informal assessments on more than 1,000 children and adolescents and is an expert in educational psychological services.  *See* Exhibit N.  Chaffey has itself hired Dr. Paltin to train their school psychologists.

50.  OAH also found Dr. Paltin unpersuasive because he never opined that the administered tests were inappropriate or inappropriately conducted, never suggested additional tests the District should have run, and did not conduct his own assessment of C.G.  *See* Exhibit A at 24, 26, 27.  Once again the ALJ erred, Dr. Paltin's clear experienced testimony was that Mr. Rivera chose proper tests (*see* Exhibit S, Testimony Paltin, p.208-209, 211, 227) and should not have ignored their findings (*see* Exhibit S, Testimony Paltin, p.205-206, 231, 243-245), and that those tests were sufficient to show that C.G. has a disability (*see* Exhibit S, Testimony Paltin, p.206, 251).  The administered tests were appropriate, and appropriately conducted; no additional assessment needed to be run, which is why he did not conduct any additional assessments on his own.  To suggest that Dr. Paltin was not persuasive, when stating one must follow the criteria of the authors of the assessment when using their tests, and not have predetermined determinations, or that he was mistaken in stating the rule all psychologists are

required to follow, which is to score the assessment and make the determination based on the score, not pressure brought by an employer, is simply wrong.  Dr. Paltin's position like that of psychologist standard of care is to not allow outside influences interfere with the reliability of the test. The ALJ's view of Dr. Paltin was wrong.  Also, Dr. Paltin had C.G. at his office to do an informal assessment and evaluation.  *See* Exhibit S, Testimony Paltin, p.231.

51.    Mr. Rivera also discounted C.G.'s low scores because he claimed C.G. did not wear glasses throughout the assessments, this "impacted his speed and his standardized tests performance."  *See* Exhibit A at 30.  OAH accepted this as well, even though Mr. Rivera conceded in his testimony that C.G. did wear his glasses at least intermittently during the assessment and that he would ask C.G. to put them on whenever he wasn't wearing them.  *See* Exhibit R, Testimony Rivera, p.58-59.

52.    The idea that C.G.'s vision can be corrected by wearing glasses, which OAH accepts and relies upon (*see* Exhibit A at 45 "[e]ven if Ballinger's classroom observation of Student's behaviors were attributable solely to Student's vision difficulties, those difficulties could be corrected with glasses, and did not affect his education"), seems to come from school psychologist Saul Rivera (*see* Exhibit R, Testimony Rivera, p.76 "With his glasses his vision's corrected and average.") who has never given an eye exam and has no qualification for diagnosing vision issues (*see* Exhibit R, Testimony Rivera, p.75-76).

53.    On the Behavior Assessment System and the Rating Scales of Impairment, C.G. showed clinically significant scores suggesting a high level of maladjustment and the presence of clinically significant and at-risk ratings in attention, work completion, and academics which were consistent with C.G.'s grades and behaviors.  *See* Exhibit A at 22.  Mr. Rivera dismissed this as

demonstrating a need for special education interventions because he believed C.G.'s sixth grade report card from Honduras showing a satisfactory personality rating and no history of behavioral or emotional issues countered this. *See* Exhibit A at 22. OAH accepted this too despite the lengthy list of his strange behaviors and lack of motivation outlined by his teachers in the Psychoeducational Assessment (*see* Exhibit H p.153-156). *See* Exhibit A at 22.

54. District speech and language pathologists Claudia Ceballos and Rhea Lynch conducted English, Spanish and bilingual assessments, including:

(1) Bilingual Articulation and Phonology Assessment.

(2) Expressive Vocabulary Test, Second Edition.

(3) Peabody Picture Vocabulary Test, Fourth Edition.

(4) Receptive One-Word Picture Vocabulary Test, Spanish-Bilingual Edition.

(5) Expressive One-Word Picture Vocabulary Test, Spanish-Bilingual Edition.

(6) Clinical Evaluation of Language Fundamentals, Fourth Edition, Spanish Edition

55. OAH admits that C.G. scored in the "single digit percentile" in some of these standardized and language tests but accepted that this was the result of C.G.'s Mayan dialect and the gap in his education, which Dr. Paltin refutes. *See* Exhibit A at 49.

56. With regard to his vision, Nurse Murphy could only conduct a partial vision test of C.G. because of language barriers and the school failing to provide her with a translator. <u>See</u> Exhibit P. Nevertheless, the testing she did showed that C.G. failed his vision acuity test. OAH claims he failed because he was not

wearing his glasses and that Plaintiff's expert Dr. Beth Ballinger did not dispute this.  *See* Exhibit A at 29.

57.   Plaintiff expert Dr. Beth Ballinger, an expert in optometry and infant/children's vision examinations (*see* Exhibit M), actually stated that Nurse Murphy's assessment could not be used to clear C.G. of disability because Nurse Murphy's assessment evaluated vision acuity only and did not include a functional vision assessment.   *See* Exhibit U, Testimony Ballinger, p.159-160. She conducted her own independent assessment and found that C.G.'s visual perception was well below average, confirming disability ("his visual-based testing is demonstrating that he is functioning well below what the other children his age are functioning at"). *See* Exhibit U, Testimony Ballinger, p.162; Exhibit L.  Dr. Ballinger's report was made available to the District before the IEP meeting on October 2, 2019.  *See* Exhibit L.

58.   Despite seeing that C.G. had failed his vision test (*see* Exhibit H p.142-143, 200), Mr. Rivera, with no qualification to assess visual impairment, refused to continue the IEP meeting to a date when Dr. Ballinger could attend to present the report in person.  *See* Exhibit L.

59.   Moreover, Mr. Rivera, with no optometry training, rejected this medical opinion and instead choose not to include a vision impairment entry in the assessment on the basis of his opinion that C.G.'s vision could be corrected with glasses, even as he noted in the assessment that the extent of the effect of C.G.'s issue was not known:

> "[C.G] has a reported issue with vision out of his right eye.  His vision acuity might have negatively impacted his performance on these highly visual tasks.  It is not possible to determine the extent of the influence without

further clarification on the specific nature of the vision problem."

*See* Exhibit H p.200.  In other words, Mr. Rivera is claiming that C.G.'s vision issues reduced his test results even though Rivera says this is impossible to know, Rivera does not include vision as an issue in the assessment even as he claims it is an issue strong enough to let him disregard the standardized testing, and Rivera says it requires further clarification but then he disputes Dr. Ballinger's testimony and qualified expert report.

60.    At the OAH hearing, Mr. Rivera claimed that C.G.'s functional vision was demonstrated by the standardized tests (*see* Exhibit R, Testimony Rivera, p.76), tests C.G. failed, and which Mr. Rivera dismissed in his analysis of C.G.  Mr. Rivera explained that failure away by arguing that C.G. had not worn his glasses when he took those tests.  *See* Exhibit A at 30; Exhibit R, Testimony Rivera, p.58-59.  Not only is that circular reasoning – we know he can succeed on tests when he wears glasses because he only failed his tests because he wasn't wearing glasses – and his own statement in the assessment refutes his claim that he can know the effect on the test, but as noted above, he did wear his glasses at times and was asked to put them on whenever he was not wearing them.  *See* Exhibit R, Testimony Rivera, p.58-59.

61.    Despite the obvious flaws in Mr. Rivera's reasoning and his failure to know the key fact upon which he relied, OAH erred again and accepted Mr. Rivera's dismissal of C.G.'s well below average scores in visual perception and visual-motor integration and his inability to copy figures quickly as being the result of C.G. not wearing glasses, even though Mr. Rivera did not know if C.G. had worn his glasses.  *See* Exhibit A at 21-22.

62.     The IEP meeting took place by phone on October 2, 2019.

63.     The meeting was conducted by Ms. Monica McCort, who came to the meeting with hostility toward C.G.'s representative, Mr. Peters.  For example, in the hearing on J.A.'s matter, Ms. McCort testified that Mr. Peters badgers witnesses and tries to stop the process:  "I've had meetings with Jim Peters, Mr. Peters.  And it is typical of him to start just kind of badgering and just trying to stop the process."  *See* Exhibit X, Testimony-J.A. McCort, p.43.   She also accused him of trying to stop meetings by hanging up:  "That's what's happened in the past if he doesn't – if he gets frustrated or does not – he's hung up many times.  And I – I've never [sic] meetings disconnect like there with him.  It's almost every meeting."  *See* Exhibit X, Testimony-J.A. McCort, p.45.  Although, she could only name one other meeting apart from C.G. and J.A. where this supposedly happened.  *See* Exhibit X, Testimony-J.A. McCort, p.65-66.

Here, she testified:

> "I think Mr. Peters was hanging up, because that's been a
> pattern in – I had warned him, even before we started – ...
> Before we started the meeting, I told Mr Peters, Jim,
> when we meet, there's a history of you hanging up.  I
> want you to know that if you hang up, we will continue
> the meeting.

*See* Exhibit V, Testimony McCort, p.164.

64.     It is against this backdrop of Ms. McCort's hostility toward Mr. Peters and Mr. Rivera ignoring Dr. Ballinger and refusing to reschedule a meeting that was already five months delayed that the IEP meeting began.

65.     Plaintiff and his representatives were cut off and they were not able to reconnect.  *See* Exhibit J.  Rather than rescheduling the meeting for a time when the parents could be reconnected, the District went forward with the

meeting without the presence of the parents, just as they had done with J.A.  *See* Exhibit J; Testimony McCort.  Contrarily, Ms. McCort testified that with other parents, they would reschedule:

> Q.    If there's a technical difficulty to have the parent participate, are you require to reconvene the IEP meeting?
>
> A.    We usually – I don't know if we're required, but I – if there's a technical difficulty, I always ask to – we – we usually just – we reconvene.

*See* Exhibit V, Testimony McCort, p.166.  She said the same in her testimony in the J.A., testifying that they normally would have reconvened in the case of "a typical IEP [if] there was a phone problem" (*see* Exhibit X, Testimony-J.A. McCort, p.73) and that she had never reconvened before when the parents got disconnected (*see* Exhibit X, Testimony-J.A. McCort, p.66).

66.    Both Mr. Rivera and Ms. Monica McCort testified that they believed it would have been important for the parents to be there to discuss the apparent conflict between the behaviors exhibited by C.G. at home compared to the very different behaviors he exhibited at school.  *See* Exhibit R, Testimony Rivera, p.67, 178; Exhibit V, Testimony McCort, p.166, 170.

67.    The IEP decision denied C.G. eligibility for special needs services. *See* Exhibit J.

68.    By continuing with the October 2, 2019 IEP meeting, and finalizing the eligibility determination and IEP, without the presence of the parents, their representative, or the independent experts who could provide a clearer assessment of C.G., the District failed to allow meaningful parent participation in the IEP process.

69.    OAH accepted the District's contention that Mr. Peters "became upset, hostile and hung up when asked to hold question until the end of Rivera's assessment findings presentation." *See* Exhibit A at 32-33.

70.    Plaintiff thereafter filed a timely petition with the State of California Office of Administrative Hearings for a due process review of the IEP decision seeking a declaration that the District had denied Plaintiff a FAPE.  The case was assigned to Administrative Law Judge Sabrina Kong and was assigned Case No. 2020010176.

71.    A hearing was held before Judge Kong under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations on March 3, 5, 12 and 16, 2020 and May 6, 2020.  20 U.S.C. § 1400 *et seq.*; 34 C.F.R. § 300.1 (2006) *et seq.*; Ed. Code, § 56000 *et seq.*; Cal. Code Regs., tit. 5, § 3000 *et seq.*

72.    Judge Kong issued her decision on June 18, 2020, denying Plaintiff's petition.  ALJ Kong denied C.G.'s petition on the basis that:

(1) There was no request for assessment because:

(a) Mr. Peters never identified C.G. by name during the April 9 phone call, which was about a different student (s*ee* Exhibit A at 8);

(b) The April 9, 2018 email "did not constitute a request for assessment because it did not identify Student by name, or state that Peters had authority to act, or was acting on Student's behalf," and "Peters never responded" to Whelan's request for their identities (s*ee* Exhibit A at 9);

(c) The April 10, 2018 email attaching C.G.'s information didn't include a request for assessment (s*ee* Exhibit A at 9); and

(d) "Student did not show that the April 9, and 10, 2018 emails

reasonably put Chaffey on notice that they were related in any way."  S*ee* Exhibit A at 9.

(2) "Chaffey had no reason to suspect that Student might require special assessment when he enrolled at Chaffey" (*see* Exhibit A at 10) because:

> (a) The enrollment form did not warn the District *(see* Exhibit A at 10);

> (b) Mr. Rangel opined C.G. "presented typically as a non-English speaking newcomer" and not as having special needs (*see* Exhibit A at 11).

> (c) C.G. showed no visual disability because "did not wear glasses in class and did not exhibit vision difficulties affecting his classwork without them." (*see* Exhibit A at 13).

(3) "Student did not meet his burden of proving that Chaffey's psychoeducational assessment was inappropriate" or that parent was denied an opportunity to participate in the IEP meeting.  *See* Exhibit A at 25, 35.

(4) Student did not show he was eligible for special education and related services.  *See* Exhibit A at 38, 39, 41, 50, 55.  Student did not show visual impairment either because he "was not impacted by a visual disability but impacted by environmental and cultural disadvantage."  *See* Exhibit A at 47.

73.   This appeal followed.

74.   Plaintiff has exhausted all procedural requirements necessary to bring this action.

75.   This matter is timely filed as it is brought within 90 days of the date of the June 18, 2020 decision of the hearing officer.  34 C.F.R. §300.516(b).

76.   Plaintiffs have been forced to retain an attorney to resolve this matter and are responsible for paying them.  The IDEA provides that the court "may

award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B).

## COUNT ONE
**Violation of Individuals with Disabilities Education Act,**
**20 U.S.C. § 1400 *et seq.* & California Education Code § 56000 *et seq.***
**Failure to Assess Upon Admission**

77.    Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 76 as though set forth fully here in.

78.    Under the Individuals with Disabilities Education Act, 20 U.S.C. §§1400-1487, students with disabilities are entitled to free appropriate public education ("FAPE").  *See* 20 U.S.C. § 1400(d)(1)(A)); 20 U.S.C. § 1400 *et. seq.*; 34 C.F.R. § 300.1 (2006) *et seq.*  California law requires this as well.  Cal. Educ. Code §56000 *et seq.*; Cal. Code Regs., Tit. 5, § 3000 *et seq.*  A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.   20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.

79.    A school district is required to actively and systematically seek out, identify, locate, and evaluate all children with disabilities who are in need of special education and related services, regardless of the severity of the disability, including those individuals advancing from grade to grade.   20 U.S.C. § 1412(a)(3)(A); Cal. Ed. Code, § 56171, 56301, subds. (a) and (b).

80.    C.G. made a request for assessment through Mr. James Peters, who already represented Parents with regard to their biological children.

81.    Mr. Peters made a request for assessment to the District through the District's Director of Special Education, Ms. Kelly Whelan, by phone and by

email.  Mr. Peter's first email specifically stated that "two children with special needs" would be enrolling in the District.  He further wrote, "they will be attending Los Osos High School, *and will require a full assessment*." (emphasis added).  When Ms. Whelan asked who these students were, Mr. Peters responded by forwarding C.G.'s birth certificate and his immigration documents, indicating that he was one of the two students mentioned in the first email.

82.    This is sufficient to constitute a referral for special education services.

83.    All referrals for special education and related services *shall* initiate the assessment process.  Cal. Code Regs., tit. 5, § 3021, subd. (a).  A referral for a special education assessment means any written request for assessment to identify an individual with exceptional needs made by a parent, teacher, or service provider of the individual.  Cal. Educ. Code, § 56029, subds. (a)-(b).  Indeed, the "informed suspicions of parents" triggers the requirement to assess.  *Timothy O. v. Paso Robles Uni. Sch. Dist.*, 822 F.3d 1105, 1119-1120 (9th Cir. 2016).

84.    Accordingly, the District became obligated to perform an assessment on C.G. on April 9, 2018.

85.    The OAH decision holding that no request for assessment was made is erroneous because:

(1) OAH erred by holding that the combination of the April 9, 2018 email, notifying the district that Mr. Peters would enroll two special needs students and seeking an assessment, combined with the April 10, 2018 follow-up email providing C.G.'s identifier information, did not alert the District that a request for assessment had been made vis-à-vis C.G.

(2) OAH erred in accepting the District's disingenuous attempt to pretend it did not know that a request had been made for an assessment or for whom the request had been made.

(3) OAH erred legally and factually by holding that the April 9 and April 10, 2018 emails did not constitute a request for assessment because Mr. Peters did not specifically state that he had the authority to represent C.G.

(4) OAH erred by failing to hold that the District was on notice that C.G. potentially had a disability and was obligated to conduct an assessment under the District's child find obligation, even if OAH did not err in requiring Mr. Peters to specifically state that he had the authority to represent C.G.

86.     The Ninth Circuit has made it clear that "when a school district is afforded reason to suspect that a child has a disability," the IDEA requires the district to "'conduct a full and individual initial evaluation' that ensures the child is assessed for 'all areas of suspected disability,' using a variety of reliable and technically sound instruments." *Timothy O. v. Paso Robles Uni. Sch. Dist.*, 822 F.3d 1105, 1109 (9th Cir. 2016) (quoting 20 U.S.C. §§ 1414(a)(1), (b)(2)-(3)); Cal. Educ. Code, § 56320(f); *Hicks v. Purchase Line Sch. Dist.*, 351 F. Supp. 2d 1250, 1253 (W.D. Pa. 2003) ("A child's entitlement to special education should not depend upon the vigilance of parents (who may not be sufficiently sophisticated to comprehend the problem)").

87.     The District needed to provide Parent with a written assessment plan or a reason why it was refusing within 15 calendar days of the request.

88.     No assessment was done until October 2, 2019, eighteen months later, long after the end of the school year.

89.     The District's failure to conduct an assessment denied Plaintiff a FAPE for the 2017-2018 and 2018-2019 school years.

90.     Courts have broad discretion to fashion an equitable remedy under the IDEA.  This can include "compensatory education" to put the student in the same position he would have been in had he received the appropriate education

from the school district in the first place. *T.B. v. San Diego Uni. Sch. Dist.*, No. 08-CV-28MMA (S.D. Cal. Mar. 30, 2011).   The IDEA does not explicitly authorize the award of compensatory education, but based on the Supreme Court's *Burlington* decision, compensatory education as a remedy has been embraced by most circuits, including the Ninth, under the IDEA's authorization that courts may "grant such relief as the court determines appropriate." *R.P. v. Prescott Unified Sch. Dist.,* 631 F.3d 1117, 1125 (9th Cir. 2011); *Parents of Student W.*, 31 F.3d at 1496 (9th Cir. 1994); *Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005); *Phil v. Mass. Dep't of Educ.*, 9 F.3d 184, 188-89 (1st Cir. 1993); *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 249 (3d Cir. 1999); *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308-09 (4th Cir. 2003); *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Ill. State Bd. of Educ.*, 79 F.3d 654, 656 (7th Cir. 1996); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986).

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter final judgment on C.G.'s behalf reversing the decision of the State of California Office of Administrative Hearings, Case No. 2020010259, and finding that Defendant CJUHSD denied C.G. his due process rights under the IDEA by denying him a FAPE for the 2017-2018 and 2018-2019 school year, and awarding Plaintiffs the following:

(a) That District should fund 60 in-office visits, plus 5 progress evaluations, for the 2017-2018 school year and 60 in-office visits, plus 5 progress evaluations, for the 2018-2019 school year for C.G. with Dr. Beth Ballinger to address monocular and binocular activities utilizing lenses and prisms that are designed to equalize saccadic eye movement ability and focusing, in addition to visual accuracy, control, fluency, flexibility, and endurance between his right and left eyes should be specifically designed to address C.G.'s visual deficits.

(b) That District should fund Transportation to and from all therapies for two years.

(c) That District should fund two years of C.G.'s attendance at Chaffey College, in subjects of C.G.'s choice for job training, with a 1:1 appropriate aide, and ELD services.

(d) That District should fund Transportation to and from college for two years.

(e) That District should fund 240 hours of individual tutoring by an NPA of Parent's choice per year for two years.

(f) That District should fund 4 hours per month of behavioral counseling with Dr. David Paltin for two years.

(g) That District should fund full comprehensive assessment in all areas of suspected disability by an NPA of Parent's choice.

(h) That District should fund two National Parent Conferences for parents regarding vision and educating the blind.

(i) That District should fund a year of Brail Institute for the Blind.

(j) That District should fund two pair of glasses.

(k) That District should provide C.G. a computer with vision enhanced software.

(l) That Plaintiff be reimbursed for his costs, fees and expenses in bringing this matter, including his attorneys' fees and expert fees, in accordance with 20 U.S.C. § 1415(i)(3)(B).

(m) That the Court award such other relief as this Honorable Court deems just and appropriate.  20 U.S.C. § 1415(i)(2)(C)(iii) ("the court... shall grant such relief as the court determines appropriate").

## COUNT TWO
### Violation of Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* & California Education Code § 56000 *et seq.* Failure to Assess Upon Notice of Disability

91.    Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 76 as though set forth fully here in.

92.     Under the IDEA, 20 U.S.C. §§1400-1487, students with disabilities are entitled to free appropriate public education ("FAPE").   *See* 20 U.S.C. § 1400(d)(1)(A)); 20 U.S.C. § 1400 *et. seq.*; 34 C.F.R. § 300.1 (2006) *et seq.* California law requires this as well.  Cal. Educ. Code §56000 *et seq.*; Cal. Code Regs., Tit. 5, § 3000 *et seq.*   A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.

93.     A school district is required to actively and systematically seek out, identify, locate, and evaluate all children with disabilities who are in need of special education and related services, regardless of the severity of the disability, including those individuals advancing from grade to grade.   20 U.S.C. § 1412(a)(3)(A); Cal. Ed. Code, § 56171, 56301, subds. (a) and (b).  This duty to seek and serve children with disabilities is known as "child find."

94.     The Ninth Circuit has made it clear that "when a school district is afforded reason to suspect that a child has a disability," the IDEA requires the district to "'conduct a full and individual initial evaluation' that ensures the child is assessed for 'all areas of suspected disability,' using a variety of reliable and technically sound instruments." *Timothy O. v. Paso Robles Uni. Sch. Dist.*, 822 F.3d 1105, 1109 (9th Cir. 2016) (quoting 20 U.S.C. §§ 1414(a)(1), (b)(2)-(3)); Cal. Educ. Code, § 56320(f); *Hicks v. Purchase Line Sch. Dist.*, 351 F. Supp. 2d 1250, 1253 (W.D. Pa. 2003) ("A child's entitlement to special education should not depend upon the vigilance of parents (who may not be sufficiently sophisticated to comprehend the problem)").

95.     A district's child find obligation toward a specific child is triggered where there is knowledge of, or reason to suspect, a disability, and reason to

suspect the student may need special education services to address that disability. *Dep't of Educ. v. Cari Rae S.*, 158 F.Supp.2d 1190, 1194 (D. Hawaii 2001). The threshold for suspicion of a disability is relatively low; the inquiry is not whether the student actually qualifies for special education services, but whether the student should be referred for an evaluation. *Id.* at 1195.

96.    The District had reason to suspect disability when C.G.'s first semester Spanish II teacher, Ms. Josafina Weber, noticed early on in his first semester that C.G. had severe vision problems.

97.    The District had reason to suspect disability when Ms. Tremblay learned from Ms. Meneses on October 16, 2018 that C.G. could only see out of one eye.

98.    The District had reason to suspect disability from Plaintiff's grades, with a 0.0 and 0.42 GPA, his truancies, and his behavior, particularly including his teachers' descriptions of C.G. as confused, immature, having inappropriate interactions with peers, and needing constant monitoring.

99.    Behavior intervention is considered a designed instruction and service (Cal. Educ. Code, §§ 56520 et seq.; Cal. Code of Regs., tit. 5, § 3052) and if a student's behavior or performance indicates a need for special education, the district is deemed to have knowledge of that fact. 20 U.S.C. § 1415(k)(8)(3)(ii).

100.    The District wrongly dismissed these red flags by assuming C.G.'s problems were the result of him being new and from Honduras.

101.    The District wrongly dismissed the suspicion of visual disability by opining that his visual disability could be corrected with glasses.

102.    A district may not circumvent its responsibility to conduct a genuine assessment by way of informal observations or the subjective opinion of staff members. *Timothy O. v. Paso Robles Uni. Sch. Dist.*, 822 F.3d 1105, 1121 (9th

35

Cir. 2016).

103.   Accordingly, the District was obligated to perform an assessment on C.G. as these behaviors became apparent with his first grade reports and his teachers' initial observations and when it learned of his visual difficulties.

104.   No assessment was done until October 2019, eighteen months after C.G. began school.

105.   The District's failure to conduct an assessment denied Plaintiff a FAPE for the 2017-2018 and the 2018-2019 school years.

106.   The OHA decision erroneously accepted the District's speculations about the causes of C.G.'s problems, irrelevant observations about supposed improvements and corrections, and *ex post facto* justifications to allow the District to wrongly dismiss these red flags and avoid its legal obligations to assess C.G.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter final judgment on C.G.'s behalf reversing the decision of the State of California Office of Administrative Hearings, Case No. 2020010259, and finding that Defendant CJUHSD denied C.G. his due process rights under the IDEA by denying him a FAPE for the 2017-2018 and 2018-2019 school years, and awarding Plaintiffs the following:

(a) That District should fund 60 in-office visits, plus 5 progress evaluations, for the 2017-2018 school year and 60 in-office visits, plus 5 progress evaluations, for the 2018-2019 school year for C.G. with Dr. Beth Ballinger to address monocular and binocular activities utilizing lenses and prisms that are designed to equalize saccadic eye movement ability and focusing, in addition to visual accuracy, control, fluency, flexibility, and endurance between his right and left eyes should be specifically designed to address C.G.'s visual deficits.

(b) That District should fund Transportation to and from all therapies

for two years.

(c) That District should fund two years of C.G.'s attendance at Chaffey College, in subjects of C.G.'s choice for job training, with a 1:1 appropriate aide, and ELD services.

(d) That District should fund Transportation to and from college for two years.

(e) That District should fund 240 hours of individual tutoring by an NPA of Parent's choice per year for two years.

(f) That District should fund 4 hours per month of behavioral counseling with Dr. David Paltin for two years.

(g) That District should fund full comprehensive assessment in all areas of suspected disability by an NPA of Parent's choice.

(h) That District should fund two National Parent Conferences for parents regarding vision and educating the blind.

(i) That District should fund a year of Brail Institute for the Blind.

(j) That District should fund two pair of glasses.

(k) That District should provide C.G. a computer with vision enhanced software.

(l) That Plaintiff be reimbursed for his costs, fees and expenses in bringing this matter, including his attorneys' fees and expert fees, in accordance with 20 U.S.C. § 1415(i)(3)(B).

(m) That the Court award such other relief as this Honorable Court deems just and appropriate.   20 U.S.C. § 1415(i)(2)(C)(iii) ("the court... shall grant such relief as the court determines appropriate").

## COUNT THREE
### Violation of Individuals with Disabilities Education Act,
### 20 U.S.C. § 1400 *et seq.* & California Education Code § 56000 *et seq.*
### Denial of Meaningful Participation in IEP Process

107.   Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 76 as though set forth fully here in.

108.   Under the Individuals with Disabilities Education Act (the "IDEA"),

20 U.S.C. §§1400-1487, students with disabilities are entitled to free appropriate public education ("FAPE").  *See* 20 U.S.C. § 1400(d)(1)(A)); 20 U.S.C. § 1400 *et. seq.*; 34 C.F.R. § 300.1 (2006) *et seq.*  California law requires this as well. Cal. Educ. Code §56000 *et seq.*; Cal. Code Regs., Tit. 5, § 3000 *et seq.*  A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.

109.  A child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an individualized education program ("IEP") reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ.* v. *Rowley*, 458 U.S. 176, 201-204 (1982); 20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031, 56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.

110.  When preparing an IEP, the school district "must comply both procedurally and substantively with the IDEA."  *M.C. v. Antelope Valley Union High Sch. Dist.*, No. 14-56344, slip op. at 5 (9th Cir. 2017); *M.L.* v. *Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citing *Rowley*, 458 U.S. at 206–07). The IDEA sets forth a number of procedural safeguards.  20 U.S.C. § 1415. These include not only properly evaluating the child but also obtaining the "input of the child's parents."  *Antelope Valley*, slip op. at 5-6 (9th Cir. 2017) (citing *Endrew F.* v. *Douglas Cty. Sch. Dist.*, 580 U.S. __, slip op. at 11 (Mar. 22, 2017)).

111.  The IDEA affords parents the procedural protection of an impartial due process hearing with respect to any matter relating to the identification,

assessment, or educational placement of the child, or the provision of a FAPE to the child. 20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.

112.   After the Parents' second request for an assessment, the District finally agreed to assess C.G.

113.   The IEP meeting was held on October 2, 2019.

114.   Parents, Mr. Peters and Plaintiff's expert Dr. Paltin attended by phone.

115.   During the meeting, Plaintiff's representatives became disconnected at least twice.

116.   Owing to antagonism by the District, the District chose to blame Plaintiff's representatives for this and decided to continue the IEP meeting without Plaintiff's representatives.

117.   The District conceded it would normally reconvene to ensure parents can participate.

118.   The District's contention that it believed Mr. Peters was angry and wanted to end the meeting was unfounded speculation warped by antagonism toward Mr. Peters, it was contrary to the facts, and it is not a legally valid reason for abandoning the procedures of the IDEA.

119.   Little substance, if any, had taken place in the thirteen minutes prior to Plaintiff's representatives being excluded.

120.   As a result of the District's decision to continue without Plaintiff's representatives, neither Parent nor Plaintiff's representatives were able to hear or participate in the substantive portions of the meeting, were able to offer information, were able to express disagreement regarding the IEP team's

conclusions, were able to request revisions, or were able to participate in the decision-making process in any meaningful way.

121.   This violated the IDEA.

122.   An educational agency must permit a child's parent "meaningful participation" in the IEP process, not just participation. *Ms. S. v. Vashon Island School Dist.*, 337 F.3d 1115, 1131-1132 (9th Cir. 2003).   A parent has meaningfully participated in the development of an IEP when he or she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. 34 C.F.R. § 300.322(a)(2006); Cal. Educ. Code, § 56341.5, subd. (a).   There is a denial of a FAPE when the district's actions significantly impede the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the child or caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E); Ed. Code, § 56505, subd. (f); *see also W.G. v. Board of Trustees of Target Range School Dist. No. 23*,960 F.2d 1479, 1483-1484 (9th Cir. 1992).

123.   While the Ninth Circuit has confirmed that not all procedural violations of the IDEA and the California Education Law will deny a child a FAPE, it has consistently held that "[p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Amanda J.* v. *Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001); *W.G. v. Board of Trustees of Target Range School Dist. No. 23*,960 F.2d 1479, 1483-1484 (9th Cir. 1992).   The United States Supreme Court has recognized that parental participation in the development of an IEP is the cornerstone of the IDEA.   *Winkleman v. Parma City School Dist.*, 550 U.S. 516, 524, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007).   Parental participation in the IEP process is considered "among the most important procedural safeguards."

*Amanda J.*, 267 F.3d at 892.  A parent is a required member of the IEP team.  20 U.S.C. § 1414(d)(1)(B)(i); Cal. Educ. Code, § 56341, subd. (b)(1).

124.    Further, as a result of the meeting continuing without Plaintiff's input, Plaintiff's expert Dr. Paltin was unable to offer his opinions or advice.

125.    The IDEA gives the child and their parents the right to be advised by experts and to have those experts testify.  20 U.S.C. § 1415(h)(1), (2);  §§ 56504.5, 56505, subds. (e)(1), (e)(2).

126.    This further violated the IDEA.

127.    The District's failure to allow Parents meaningful participation in the IEP meeting violated the IDEA and denied Plaintiff a FAPE for the 2019-2020 school year.

128.    The OHA decision wrongly accepted the District's improper excuses for continuing the hearing without Plaintiff's representatives, failed to address the importance of parental participation, and failed to properly address the facts to the law.

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court enter final judgment on C.G.'s behalf reversing the decision of the State of California Office of Administrative Hearings, Case No. 2020010259, and finding that Defendant CJUHSD denied C.G. his due process rights under the IDEA by denying him a FAPE for the 2019-2020 school year, and awarding Plaintiffs the following:

(a) That District should fund 60 in-office visits, plus 5 progress evaluations, for the 2019-2020 school year for C.G. with Dr. Beth Ballinger to address monocular and binocular activities utilizing lenses and prisms that are designed to equalize saccadic eye movement ability and focusing, in addition to visual accuracy, control, fluency, flexibility, and endurance between his right and left eyes should be specifically designed to address C.G.'s visual deficits.

(b) That District should fund Transportation to and from all therapies for one year.

(c) That District should fund one year of C.G.'s attendance at Chaffey College, in subjects of C.G.'s choice for job training, with a 1:1 appropriate aide, and ELD services.

(d) That District should fund Transportation to and from college for one year.

(e) That District should fund 240 hours of individual tutoring by an NPA of Parent's choice.

(f) That District should fund 4 hours per month of behavioral counseling with Dr. David Paltin for one year.

(g) That District should fund full comprehensive assessment in all areas of suspected disability by an NPA of Parent's choice.

(h) That District should fund two National Parent Conferences for parents regarding vision and educating the blind.

(i) That District should fund a year of Brail Institute for the Blind.

(j) That District should fund two pair of glasses.

(k) That District should provide C.G. a computer with vision enhanced software.

(l) That Plaintiff be reimbursed for his costs, fees and expenses in bringing this matter, including his attorneys' fees and expert fees, in accordance with 20 U.S.C. § 1415(i)(3)(B).

(m) That the Court award such other relief as this Honorable Court deems just and appropriate.  20 U.S.C. § 1415(i)(2)(C)(iii) ("the court... shall grant such relief as the court determines appropriate").


## <u>COUNT FOUR</u>
### Violation of Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* & California Education Code § 56000 *et seq.* Improper Assessment of Disability

129.   Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 76 as though set forth fully here in.

130.    Under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§1400-1487, students with disabilities are entitled to free appropriate public education ("FAPE").  *See* 20 U.S.C. § 1400(d)(1)(A)); 20 U.S.C. § 1400 *et. seq.*; 34 C.F.R. § 300.1 (2006) *et seq.*   California law requires this as well. Cal. Educ. Code §56000 *et seq.*; Cal. Code Regs., Tit. 5, § 3000 *et seq*.  A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.

131.    A child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ.* v. *Rowley*, 458 U.S. 176, 201-204 (1982); 20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031, 56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.

132.    When preparing an IEP, the school district "must comply both procedurally and substantively with the IDEA."  *M.C. v. Antelope Valley Union High Sch. Dist.*, No. 14-56344, slip op. at 5 (9th Cir. 2017); *M.L.* v. *Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citing *Rowley*, 458 U.S. at 206–07). The IDEA sets forth a number of procedural safeguards.  20 U.S.C. § 1415. These include not only properly evaluating the child but also obtaining the "input of the child's parents."  *Antelope Valley*, slip op. at 5-6 (9th Cir. 2017) (citing *Endrew F.* v. *Douglas Cty. Sch. Dist.*, 580 U.S. __, slip op. at 11 (Mar. 22, 2017)).

133.    The IDEA affords parents the procedural protection of an impartial

due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of a FAPE to the child. 20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.

134.   After the Parents' second request for an assessment, the District finally agreed to assess C.G.

135.   The IEP meeting was held on October 2, 2019 and an IEP document produced.  That IEP process and document does not represent the result of an impartial substantive analysis.   The IEP team wrongly prejudged C.G.'s disabilities as being the result of his educational background, his lack of English and his Mayan dialect, it further wrongly prejudged his visual disabilities as being correctable with glasses, and the IEP team wrongly relied upon the improper opinions of staff to make such a finding and hold that C.G. did not have a disability.

136.   Specifically, the IEP document incorporated conclusions from various teachers that C.G. had no disability but ignored or excluded statements from these same teachers which describe C.G. as having behaviors suggestive of a disability, and as dismissing those behaviors as typical of a newly arrived foreign student.

137.   Further, Mr. Rivera, the District Psychologist, administered a series of tests which he believed to be appropriate, and which Plaintiff's expert Dr. Paltin confirmed were appropriate.  But when the results showed that C.G. had a disability, Mr. Rivera reversed himself and wrongly decided these tests were not appropriate after all because of C.G.'s lack of English ability and his educational background.  Instead, he chose to rely upon his own observations of C.G. and the opinions of C.G.'s teachers that C.G. had no disability – ignoring the comments

they provided which suggested he might have a disability.

138.   Mr. Rivera also ignored the testimony and report of a qualified optometrist expert who testified that C.G. had a visual disability and wrongly substituted his own opinion that C.G.'s disability could be corrected with glasses.

139.   A district may not circumvent its responsibility to conduct a genuine assessment by way of informal observations or the subjective opinion of staff members, which is exactly what Mr. Rivera did here. *Timothy O. v. Paso Robles Uni. Sch. Dist.*, 822 F.3d 1105, 1121 (9th Cir. 2016).

140.   The standardized tests Mr. Rivera administered indicated that C.G. has a disability.

141.   The testimony of Dr. David Paltin confirmed that C.G. has a disability.

142.   The report and testimony of Dr. Beth Ballinger showed that C.G. has a visual disability.

143.   By ignoring or dismissing every piece of evidence that C.G. had a disability, be it teacher testimony, Parent comments, the consistent results of appropriate standardized tests chosen by Mr. Rivera himself before he knew their outcomes, C.G.'s history of needing special needs services, C.G.'s grades and academic performance, excluding the Parents and Dr. Paltin, and instead replacing all of this with Mr. Rivera's own opinions and cherry-picked and contradicted observations of his teachers, Mr. Rivera and the IEP team produced a document that utterly fails to meet the expectations of the IDEA of an impartial process to identify, assess and place C.G.

144.   By ignoring the testimony and report of qualified expert optometrist Dr. Beth Ballinger and instead opining, without valid justification, that C.G.'s disability can be corrected with glasses, Mr. Rivera and the IEP team produced a

document that utterly fails to meet the expectations of the IDEA of an impartial process to identify, assess and place C.G.

145.   As a result of the District's reliance on this IEP, the District denied C.G. a FAPE for the 2017-2018, 2018-2019 and 2019-2020 school years.

146.   The OHA decision compounded this by wrongly accepting Mr. Rivera improper dismissal of the objective evidence and letting Mr. Rivera substitute his opinions and the cherry-picked and contradicted opinions of the staff.

147.   The District denied C.G. a FAPE by relying on this IEP, and the OHA failed both legally and factually in its determination by upholding that IEP process.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter final judgment on C.G.'s behalf reversing the decision of the State of California Office of Administrative Hearings, Case No. 2020010259, and finding that Defendant CJUHSD denied C.G. his due process rights under the IDEA by denying him a FAPE for the 2017-2018, 2018-2019, and 2019-2020 school years, and awarding Plaintiffs the following:

(a) That District should fund 60 in-office visits, plus 5 progress evaluations, for the 2017-2018 school year and 60 in-office visits, plus 5 progress evaluations, for the 2018-2019 school year and 60 in-office visits, plus 5 progress evaluations, for the 2019-2020 school year for C.G. with Dr. Beth Ballinger to address monocular and binocular activities utilizing lenses and prisms that are designed to equalize saccadic eye movement ability and focusing, in addition to visual accuracy, control, fluency, flexibility, and endurance between his right and left eyes should be specifically designed to address C.G.'s visual deficits.

(b) That District should fund Transportation to and from all therapies for three years.

(c) That District should fund three years of C.G.'s attendance at Chaffey College, in subjects of C.G.'s choice for job training, with a 1:1 appropriate aide, and ELD services.

(d) That District should fund Transportation to and from college for three years.

(e) That District should fund 240 hours of individual tutoring by an NPA of Parent's choice per year for three years.

(f) That District should fund 4 hours per month of behavioral counseling with Dr. David Paltin for three years.

(g) That District should fund full comprehensive assessment in all areas of suspected disability by an NPA of Parent's choice.

(h) That District should fund two National Parent Conferences for parents regarding vision and educating the blind.

(i) That District should fund a year of Brail Institute for the Blind.

(j) That District should fund two pair of glasses.

(k) That District should provide C.G. a computer with vision enhanced software.

(l) That Plaintiff be reimbursed for his costs, fees and expenses in bringing this matter, including his attorneys' fees and expert fees, in accordance with 20 U.S.C. § 1415(i)(3)(B).

(m) That the Court award such other relief as this Honorable Court deems just and appropriate.   20 U.S.C. § 1415(i)(2)(C)(iii) ("the court... shall grant such relief as the court determines appropriate").

## COUNT FIVE
### Civil Rights Violations

148.   Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 76 as though set forth fully here in.

149.   Defendant District is a public entity organized and existing pursuant to the laws of the State of California to act as a public school district.

150.   As a public school district, Defendant is possessed by virtue of State

47

and Federal law with the responsibility for the education of C.G. in accordance with the IDEA, 20 U.S.C. §§ 1400-1487.

151.   Under the IDEA students with disabilities are entitled to free appropriate public education ("FAPE").   *See* 20 U.S.C. § 1400(d)(1)(A)); 20 U.S.C. § 1400 *et. seq.*; 34 C.F.R. § 300.1 (2006) *et seq.*   California law requires this as well.   Cal. Educ. Code §56000 *et seq.*; Cal. Code Regs., Tit. 5, § 3000 *et seq*.   A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.   20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.

152.   A child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.   *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ.* v. *Rowley*, 458 U.S. 176, 201-204 (1982); 20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031, 56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.

153.   Defendant District acted under color of law when it enrolled Plaintiff and placed him academically.

154.   Defendant District acted under color of law when it chose not to assess Plaintiff for his eligibility for special needs.

155.   Defendant District acted under color of law when it chose to place Plaintiff in the Newcomer Program.

156.   Defendant District acted under color of law when it conducted the October 2, 2019 IEP meeting.

157.   Defendant District acted under color of law when it denied Plaintiff

eligibility for special education.

158.   Defendant District discriminated against Plaintiff and denied him his right to a FAPE under the IDEA and thereby his right to a basic minimum education by choosing not to assess Plaintiff.

159.   Defendant District discriminated against Plaintiff and denied him his right to a FAPE under the IDEA and thereby his right to a basic minimum education by placing Plaintiff in the Newcomer Program.

160.   Defendant District discriminated against Plaintiff and denied him his right to a FAPE under the IDEA and thereby his right to a basic minimum education by failing to conduct an impartial IEP process to identify, assess and place him.

161.   Defendant District discriminated against Plaintiff and denied him his right to a FAPE under the IDEA and thereby his right to a basic minimum education by denying his eligibility for special education.

162.   Defendant District's discriminatory conduct is the result of the District and its employees prejudging non-English speaking and/or foreign students in such a way that it ignores traits that should trigger a special needs assessment on the basis that these traits are typical for foreign students.

163.   The Defendant District's conduct violated the IDEA.

164.   The IDEA may be enforced through 42 U.S.C. §1983, which creates a private right of action against officials acting under color of state law who deprive a person of their federal rights. *Smith v. Guilford Bd. Of Educ.*, 226 Fed. Appx. 58 (2d Cir. 2007) ("[i]t is well-settled that, while the IDEA itself does not provide for monetary damages, plaintiffs may sue pursuant to [Section 1983] to enforce its provisions – including the right to a FAPE – and to obtain damages for violations of such provisions.").

165. The Defendant District's conduct deprived Plaintiff of a basic minimum education.

166. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. This protects "fundamental rights and liberties," such as the right to a basic minimum education, which right has been defined by Congress through the IDEA. The Defendant District violated the Due Process Clause of the Fourteenth Amendment by depriving Plaintiff of a basic minimum education.

167. Further, because the Defendant District's conduct discriminates against children with disabilities, as compared to children without disabilities, as it deprives them of a basic minimum education which it does not do to children without disabilities, their conduct likewise violates Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794 as amended), which prohibits discrimination against any person who has a disability on any federally-funded "program or activity." 42 U.S.C. §12131-12132. Section 504 of the Rehabilitation Act of 1973 protects public school children who have disabilities. For the same reasons, it violates Title II of the Americans with Disabilities Act of 1990 ("ADA")); 29 U.S.C. § 794, *et seq.*

168. Further, because the Defendant District's conduct discriminates against foreign students, the District has violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which prohibits discrimination on the basis of race, color, and national origin.

169. Plaintiff is entitled to compensation for the injury he suffered as a result of the Defendant District's misconduct and the violation of his civil rights alleged herein.

170.   This Court has the authority to award attorneys fees and costs under 42 U.S.C. §1983, pursuant to 42 U.S.C. §1988, and under 20 U.S.C. § 1415(i)(3)(B).

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter final judgment on C.G.'s behalf for the violation of his civil rights and award compensation for his injuries as well as reimbursement for the attorneys fees and costs incurred in seeking the vindication of their rights herein.

DATED: September 16, 2020



BY: _____

Fazil A. Munir, Esq. (Bar # 277108)
Sheila Bayne, Esq. (Bar # 123801)
LAW OFFICES OF FAZIL A. MUNIR, ESQ.
4000 MacArthur Blvd.,
East Tower, Suite #600
Newport Beach, CA 92660
Telephone: (949) 636-6994
Facsimile: (714) 276-6437
fazil@autismlaws.com
Sheila@autismlaws.com

Deborah S. Reisdorph, Esq. (Bar # 164066)
SKANADORE REISDORPH LAW OFFICE
16541 Gothard St, #208
Huntington Beach, CA 92647
Telephone: (714) 375-1529
Deborah@ladylawca.com

**Attorneys for Plaintiff**

*GUEVARA v. CHAFFEY JOINT UNION HIGH SCH. DIST., PLAINTIFF'S COMPLAINT, Appeal of OAH Case No. 2020010176*